**NOT FOR PUBLICATION**                                                                **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY CABLE TELECOMMUNICATIONS ASSOCIATION, et al., | Civil Action No.: 08-2093 (JLL) |
| Plaintiffs, | **OPINION** |
| v. |  |
| JEANNE M. FOX, et al., in their official capacity as Commissioners of the New Jersey Board of Public Utilities |  |
| Defendants. |  |

**LINARES**, District Judge.

This matter comes before the Court by way of a motion for judgment on the pleadings filed by Plaintiffs pursuant to Federal Rule of Civil Procedure 12(c), a cross motion for judgment on the pleadings filed by Defendants pursuant to Rule 12(c), a cross motion for judgment on the pleadings filed by Intervenor Verizon New Jersey Inc. ("Verizon") pursuant to Rule 12(c), and a cross motion to dismiss filed by Intervenor New Jersey Division of Rate Counsel ("Rate Counsel") pursuant to Rule 12(b)(6). In their Complaint Plaintiffs challenge New Jersey Statute § 48:5A-28, arguing that it is preempted by Title VI of the Federal Communications Act. The Court held oral arguments on March 9, 2009. The Court has considered the submissions made in support of and in opposition to the motion as well as the arguments made at the March 9 hearing. For the reasons set forth below, the Court dismisses the Complaint without prejudice.

I.  **BACKGROUND**

In New Jersey, the New Jersey Cable Television Act governs the franchise process, and the New Jersey Board of Public Utilities ("BPU") is authorized as the local franchising authority (LFA) for cable services.  In 2006, New Jersey amended the Act to permit system-wide franchises, replacing the prior system that required a cable company to seek municipal consent for each local franchise.  Now, a company seeking to provide cable services in New Jersey can apply for a statewide franchise from the BPU.  Applicants for a system-wide franchise are required to comply with a statutorily defined set of terms and conditions, including a requirement for public, educational, and governmental ("PEG") programming.  N.J. Stat. Ann. § 48:5A-28(i).  This provision provides in part that: "Any and all CATV companies operating in a municipality shall provide interconnection to all other CATV companies on reasonable terms and conditions, and the board shall adopt regulations and procedures by which disputes between such CATV companies shall be determined and expeditiously resolved."  Id.  Prior to enactment of this law, most municipalities in New Jersey were served by a single cable operator.

On December 15, 2006, Verizon was granted a New Jersey system-wide cable provider franchise.  Verizon sought interconnection with the existing cable companies.  Unable to reach voluntary agreements, in June 2007, it requested BPU assistance to resolve its interconnection disputes with the cable companies.  In May 2008, the BPU conducted hearings regarding Verizon's request for interconnection assistance.  Prior to the BPU issuing any orders, Verizon entered into voluntary interconnection agreements with Comcast and Time Warner; the BPU, therefore, did not issue any orders for these parties.  (See Ltr. from the BPU dated Feb 27, 2009, including the Orders, (CM/ECF No. 45) [hereinafter "BPU Status Ltr."]; see also March 9

Hearing Tr. 8:9-12 [hereinafter "Tr."].)  On October 15, 2008, the BPU issued Orders regarding interconnection with U.S. Cable of Paramus-Hillsdale ("U.S. Cable") and with Cablevision.[1]  The Orders state that "[t]he parties may, if they wish, negotiate an agreement with terms different from those set forth in this Order," including agreeing that interconnection is not necessary.  (BPU Status Ltr.)  In the absence of a private agreement, the Orders set a timeline for compliance.

In the status update to this Court, confirmed at the March 9 hearing, the BPU stated that "[t]o the best of the Board's understanding, [the] parties [subject to its Orders] have not entered into voluntary interconnection agreements or opted to interconnect under the terms of the orders because Verizon New Jersey has opted to provide [PEG] programming through its own facilities rather than interconnection."  (Id.)  This understanding was based in part on letters from Verizon to the BPU, provided to this Court after the March 9 hearing.  In a letter to the BPU dated December 17, 2008, after issuance of the BPU Orders, Verizon stated:

> Verizon and Cablevision . . .have been unable to negotiate the terms of an acceptable agreement.  Rather than continue to pursue interconnection with Cablevision, Verizon intends to utilize its own network facilities to obtain and deliver PEG content to the municipalities it serves in Cablevision's territory.  Under the circumstances, the utilization of Verizon's facilities to provide PEG is in the best interest of Verizon's subscribers.  Verizon also intends to utilize its own network facilities to obtain and deliver PEG content to the two municipalities served by U.S. Cable.

Cablevision responded to the BPU addressing the substance of the BPU's Order.  Verizon responded in a letter to the BPU dated January 13, 2009, reaffirming its earlier statement.  In addition to addressing Cablevision's arguments regarding the content of the Orders, Verizon stated: "Cablevision's entire letter rests on a false premise–that Verizon intends to interconnect

---

[1] This information was provided to the Court on February 27, 2009, upon request for a status update by the Court; no party provided this information prior to the Court's request.

with Cablevision.  That is not the case.  Verizon intends to build its own facilities . . . ."  At the March 9 hearing, the General Counsel for Verizon stated that it has already begun building such facilities.  (See Tr. 20:24-21:1-2.)

At the March 9 hearing Verizon asserted, and the BPU confirmed, that the time lines specified in the Orders have passed.  Thus, the Orders are currently unenforceable–if Verizon wanted further BPU interconnection assistance, it would have to make a new request with the BPU either to extend the deadlines or make new request for assistance.  (See id. 20:19-23; 23:9-14.)  The attorney for the BPU stated that without an additional request for assistance, it would take no action.  (See id. at 57:2-5 ([T]he orders had deadlines that have passed.  At this point in order for Verizon to reactivate the Orders, they would need to come back to the Board.  They missed their deadlines.").)  He went on to state that even if Verizon came back and tried to reactivate the orders that they likely would not be reactivated based simply on the request, opining that the likelihood is that the matter would be "open[ed] . . . up for all comers . . . giving Comcast and Cablevision and other cable companies . . . significant opportunity to provide comment and argument against that action taking place."  (Id. at 57:12-22.)  He also confirmed that presently there are no requests for assistance for PEG interconnection pending before it.  (See id. at 6:22-7:6.)

Finally, "[g]iven the costs of constructing facilities to provide cable service," Verizon asserts that "it is unlikely, at this time, that new service providers will seek to provide cable service in New Jersey."  (Mem. of Law on Behalf of Verizon New Jersey, Inc. in Supp. of its Cross-Mot. for J. on the Pleadings Pursuant to R. 12(c) and in Opp'n to Pltfs.'s Mot. for J. on the Pleadings at 24 n.69; see also Tr. 22:6-10 (Verizon's General Counsel stating: "[T]here are a very

limited number of incumbent telecommunications providers in New Jersey, and certainly we are aware of none of them that are considering this.  Indeed, it has been enacted for a few years now, and none have come forward.").)  The other parties have not contested this assertion.

Plaintiffs filed their original Complaint on April 29, 2008; an Amended Complaint was filed on April 30, 2008.  Plaintiffs assert that the "New Jersey law is contrary to and conflicts with federal law," and, thus, is "pre-empted and superseded by the Constitution's Supremacy Clause." (Am. Compl. ¶¶ 26, 38.)  At the time the Complaint was filed, the BPU had yet to issue any Orders implementing the New Jersey law, thus, the claims were brought as a facial challenge to the statute.  They filed the present motion for judgment on the pleadings on August 7, 2008.  In response, Defendant BPU and Intervenor Verizon filed cross motions for judgment on the pleadings, and Intervenor Rate Counsel filed a cross motion to dismiss.

## II.  DISCUSSION

All briefing for the present motions addressed the merits of Plaintiffs' preemption arguments; neither Defendants nor Intervenors raised the issues of ripeness or mootness.  Because this Court doubted that a current case or controversy exists, the Court gave the parties an opportunity to address this issue at the March 9 hearing.

The Third Circuit has held that "considerations of ripeness are sufficiently important that the court is required to raise the issue *sua sponte* even though the parties do not" because "[t]he existence of a case and controversy is a prerequisite to all federal actions." Peachlum v. City of York, 333 F.3d 429, 433 (3d Cir. 2003).  The Supreme Court in Abbott Laboratories v. Gardner set forth a two step test for determining ripeness: (1) whether the issue is fit for judicial decision, and (2) whether the challenging party would suffer hardship is the matter was delayed.  387 U.S.

136, 149 (1967); see also Peachlum, 333 F.3d at 434.  Additionally, in determining if a matter is ripe, a "district court is not limited to the face of the pleadings;" the court "may inquire . . . into facts as they exist." Taylor Inv., Ltd. v. Upper Darby Township, 983 F.2d 1285, 1290 & n.7 (3d Cir. 1993).

In Toilet Goods Association, Inc. v. Gardner, the Supreme Court held that even though the issue as framed by the parties was "purely legal," the matter was not ripe because that consideration was "outweighed by other considerations." 387 U.S. 158, 163 (1967).  Toilet Goods involved an administrative ruling providing that the Commissioner of Food Drugs "may immediately suspend certification service" to persons who refused to permit Food and Drug Administration employees from inspecting manufacturing facilities.  Id. at 161.  The Court stated that "[a]t this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order." Id. at 163.  The Court also noted that "[t]his is not a situation in which primary conduct is affected," because "no advance action [was] required of cosmetics manufacturers, who . . . [were already] under a statutory duty to permit reasonable inspections." Id. at 164.  Finally, the Court stated:

> Moreover, no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection. Unlike the other regulations challenged in this action, in which seizure of goods, heavy fines, adverse publicity for distributing "adulterated" goods, and possible criminal liability might penalize failure to comply, a refusal to admit an inspector here would at most lead only to a suspension of certification services to the particular party, a determination that can then be promptly challenged through an administrative procedure, which in turn is reviewable by a court.

Id. at 164-65 (internal citations omitted).

More recently, in National Park Hospitality Association v. Department of the Interior, the

Supreme Court stated that where a law or regulation has no immediate impact on the primary conduct of a challenging party, courts have found cases not ripe for judicial review. 538 U.S. 803, 810-11 (2003) (citing Toilet Goods). The Court disagreed with the petitioner's argument that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis." Id. at 811. This is not to say that uncertainty may never be enough. Where fundamental rights are stake, such as first amendment rights, even a remote threat of hardship may be sufficient where the question at issue is "predominantly legal" and there is no need for additional factual development. See Peachlum, 333 F.3d at 435. Here, no one is asserting that fundamental rights are at stake.

This Court finds that this case was not ripe when brought. Like Toilet Goods, as initially framed by Plaintiffs, the question presented is a purely legal one–whether New Jersey can mandate any form of PEG "interconnection" consistent with the Federal Communications Act. However, the Court also finds that other considerations weigh against judicial resolution at this time. In fact, given the statute at issue here and the facts presented, the Court finds these factors to be even more significant than in Toilet Goods. The New Jersey statute at issue states:

> Any and all CATV companies operating in a municipality shall provide interconnection to all other CATV companies on reasonable terms and conditions, and the board shall adopt regulations and procedures by which disputes between such CATV companies shall be determined and expeditiously resolved.

N.J. Stat. Ann. § 48:5A-28(i). Plaintiffs focus their arguments on the first half of this sentence. But, this Court finds the second half of the sentence to be significant. Reading the first phrase in isolation, the statute could be read to mandate immediate action by the cable companies. However, when read together, the impression is that, as written, this is a dispute resolution

provision whereby the BPU plays a passive role, only getting involved to resolve disputes when the private parties are unable to reach some agreement.

On its face, the statute does not set forth any penalties for a failure to negotiate or if an agreement is not reach. It does not set forth what possible actions the BPU may take when assistance is requested. This reading was confirmed at the March 9 hearing. The following exchanges occurred between the Court and the BPU attorney, Mr. Sheehan:

> Court: If no one comes to the BPU to ask for your help with regard to this interconnection or your input, . . . is there anything that the law in your view requires or mandates from the providers vis-a-vis interconnection . . . ?
> Mr. Sheehan: They are certainly entitled to negotiate, but in the absence of a negotiated agreement, no, I believe that it would be to come to the Board for the Board to exert its jurisdiction. . . .
> Court: [D]o you dictate ahead of time what rates or what amount of money they must agree on, or the parameters of the money, or anything like that with regard to the negotiations?
> Mr. Sheehan: No, your Honor.
> (Tr. 62:24-63:13.)
> * * *
> Court: Absent an order from the Board, are there any parameters that they are forced to negotiate under?
> Mr. Sheehan:  The statute just says reasonable terms and conditions. The Board has not expanded on that.
> (Id. at 63:21-25.)

The Court asked a similar question to Plaintiffs' counsel, Mr. Brand:

> Court: Before the issuance of any order, would you be forced to do anything by virtue of the law, and the answer is no, correct?
> Mr. Brand: I certainly–I have not researched this. I don't know if later the BPU could come back and say something along the lines of, well, we told you guys to interconnect, to negotiate. No interconnection has happened, and now we will fine you or something like that. *I don't know if that could happen, or if it something to worry about*.

(Id. at 64:24-65:8 (emphasis added).) Thus, here, unlike in Toilet Goods, there exists no clear order requiring Plaintiffs to do anything, much less anything with defined penalties for

noncompliance; Plaintiffs' counsel did not even know of possible penalties much less the real impact they may possibly have on Plaintiffs.

Additionally, when the Complaint was filed, any action that the BPU would take *if* its dispute resolution assistance was requested by Verizon (the only company entering the market) was also unclear given the broad wording of the statute. The Court asked Plaintiffs' counsel what options the BPU could have taken in response to Verizon's request. (Id. at 71:11-15 ("[T]hey could have agreed with you . . . . They could have done that, right?")  Mr. Brand responded: "Frankly, that is not a question I have given much thought to." (Id. at 71:17-18.)  Later, Mr. Brand added that the BPU could have agreed with its position, as expressed in the hearing before the BPU, that federal law did not permit it to do what Verizon was requesting. (Id. at 73:13-16.) Thus, at the time of filing, any potential harm to Plaintiffs from the statute was completely speculative. The statute on its face does not affect Plaintiffs' primary conduct–it does not require any action of Plaintiffs except perhaps a directive that they should negotiate for PEG interconnection, and that *if* negotiation is unsuccessful, the other party *may* go to the Board, at which time the Board would issue an order, after an opportunity for the parties to present their arguments, which *could* require *some* type of interconnection and which *may* have *some undefined* penalties for noncompliance.

However, this alone does not resolve the matter. "[R]ipeness is peculiarly a question of timing, and "it is the situation now . . . that must govern." Anderson v. Green, 513 U.S. 557, 559 (1995) (quoting Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 140 (1974)). Therefore, the question is whether the new facts presented in the BPU's status update or at the March 9 hearing demonstrate that the case has become ripe. Since the filing of the Complaint, the BPU has issued

two Orders purportedly mandating interconnection. However, the Orders make clear that interconnection is not required; the parties are free to reach any other private agreement, including an agreement to forgo interconnection. It is also unclear what penalties, if any, the BPU would seek if it were required to enforce its Orders. In any case, the time lines for enforcing the Orders in the absence of a private agreement have passed. And, Verizon, despite its inability to reach agreements with the two companies subject to the Orders, chose not to enforce the Orders. Rather, it chose to build its own facilities directly to the PEG programming source, forgoing interconnection.

      Also, at present, no requests for PEG interconnection assistance are pending before the BPU, and, since none of the parties expect another applicant for a system-wide franchise in the near future, a new request for assistance is not likely, much less imminent. Therefore, the Court finds that the new facts before it do not demonstrate that the case is now ripe. On the contrary, they tend to confirm this Court's initial assessment regarding how speculative the possible outcomes were at the onset of the litigation. Even after the Orders were issued, no action against Plaintiffs is imminent–in fact, no action may ever be demanded or required–and no penalties have been threatened. If any concrete action is threatened at some point in the future, Plaintiffs will have ample opportunity to seek redress at that time.

      Finally, Plaintiffs argue that the appropriate question before the Court at this time is whether the matter has become moot as a result of the new facts presented, or, more specifically, whether Verizon's "voluntary cessation" of seeking interconnection is sufficient to moot the action. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631

(1979); <u>Nextel W. Corp. v. Unity Township</u>, 282 F.3d 257, 261 (3d Cir. 2002). Because this case was not "very much alive when the suit was filed," there was no live controversy to become moot. As discussed above, the Court finds that the better question is whether it has become ripe, which it has not so found. Therefore, the Court does not find it necessary to rule on Plaintiffs' arguments regarding whether Verizon's actions have made the controversy moot. However, this Court does note that even had it reached this issue, the case presented here is unusual and does not fit into the four corners of the typical mootness analysis.

Plaintiffs argue that all that happened subsequent to the filing of the Complaint is that Verizon ceased its conduct, that it is "at any time free to pick up where it left off." (Tr. 12:6-7.) It argues such "voluntary cessation" is not sufficient to make a matter moot. It is settled as a general principle that "voluntary cessation of a challenged practice" does not moot a case unless "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 189 (2000). In a recent Third Circuit case, the court found "two factors significant in evaluating whether there [was] a 'reasonable expectation'" that the alleged violation would recur: defendant "did not change its sexual harassment policy for more than a year after the commencement of litigation and then only near the end of discovery, less than three weeks before the dispositive motions deadline" and defendant "defended and continue[d] to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy"). <u>DeJohn v. Temple Univ.</u>, 537 F.3d 301, 309 (3d Cir. 2008) (holding that the case was not moot).

As an initial matter, one thing that is very different than a typical mootness case dealing with voluntary cessation, such where a defendant is allegedly releasing toxic chemicals into rivers

or people are being harmed by harassment, here, Verizon has not engaged in any "wrongful" behavior. It has sought to negotiate business agreements for interconnection with its competitors. The alleged wrongful conduct at issue here is the action of the Defendants, the BPU Commissioners, potentially mandating PEG interconnection. But, even this is complicated by the fact that the BPU is a passive body with regard to the statute in question–it will not engage in any conduct if not requested. Arguably, if Verizon may make a new request for interconnection assistance, then it may trigger the BPU to act, resuming the potentially "wrongful" conduct. But, in any case, as discussed in detail above, this is case where it is clear that no harm has occurred to date and any potential harm is very speculative regardless of the action of any party. Additionally, even if Verizon's conduct is the appropriate conduct to evaluate, it has started building facilities in lieu of interconnection. The costs associated with this is substantial–Verizon's General Counsel at the March 9 hearing estimated that each line would cost tens of thousands of dollars and that they were estimating that approximately 100 lines would be built. (See Tr. 66:19-67:16.) The point of seeking interconnection was to avoid this cost. Therefore, it is not reasonably likely that Verizon would then seek to get access from Plaintiffs that it has already secured itself. And, if it is unlikely that Verizon would seek interconnection assistance, it is unlikely that any new BPU order mandating interconnection will be issued.

      Also, this simply is not a case where a defendant is trying to use the mootness doctrine to manipulate the system by ending the litigation and then "return[ing] to his old ways." See City News & Novelty v. City of Waukesha, 531 US 278, 284 n.1 (2001) ("[The voluntary cessation] rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."). Although Verizon had notified the

BPU and Plaintiffs that it was no longer seeking interconnection (or seeking to enforce the Orders), neither the BPU nor Verizon notified this Court in an effort to stop the litigation. In fact, none of the parties even supplied updated information to this Court.

Finally, "by the time mootness is an issue, the case [often] has been brought and litigated . . . for years[, and] . . . abandon[ing] the case at an advanced stage may prove more wasteful than frugal." Friends of the Earth, 528 U.S. at 191-92 (reiterating, however, that "[t]his argument . . . does not license courts to retain jurisdiction over cases in which one or both of the parties lack a continuing interest"). This is also not the case here. This case is less than a year old and no discovery has taken place; in fact, an initial status conference has yet to take place.

### III. CONCLUSION

For the reasons discussed herein, this Court finds that the current matter is not ripe for adjudication. Therefore, this Court denies Plaintiffs', Defendants', and Intervenors' motions and hereby dismisses the Complaint without prejudice. An appropriate Order accompanies this Opinion.

DATED: March 17, 2009            /s/ Jose L. Linares
                                 JOSE L. LINARES
                                 UNITED STATES DISTRICT JUDGE